Trinity Jordan (15875)
Aaron B. Clark (15404)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main Street, Ste. 2400
Salt Lake City, Utah 84111
Telephone: (801) 415-3000
Email: trinity.jordan@dentons.com
　　　aaron.clark@dentons.com

*Attorneys for Steven Willing*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>VINT WADE, DONNA WADE, and STEVEN WILLING<br><br>　　　　　　Defendants. | **DEFENDANTS' JOINT MOTION TO DISMISS COUNTS 1, 2, 3 4 AND 6 FOR UNCONSTITUTIONAL VAGUENESS**<br><br>Case No. 4:23-cr-00077<br><br>Judge David O. Nuffer |

Defendants Steven Willing, Vint Wade and Donna Wade ("**Defendants**"), by and through counsel, hereby submits this Joint Motion to Dismiss Counts 1, 2, 3, 4 and 6 for unconstitutional vagueness (the "**Motion**").

### <u>Introduction</u>

The Paleontological Resources Preservation Act ("PRPA") prohibits the removal or mislabeling of "paleontological resources" from federal land. But PRPA's definition of "paleontological resources" provides no notice to a person of ordinary intelligence what a "paleontological resource" is, or what conduct may invite criminal charges. The statute defines "paleontological resources" as "*any fossilized remains, traces, or imprints of organisms, preserved in or on the earth's crust, that are of paleontological interest and that provide information about*

*the history of life on earth*."[1] In other words, "paleontological resources" are fossils "of paleontological interest"—a tautology—"that provide information about the history of life on earth." But every fossil provides *some* "information about the history of life on earth," even if only that there was previously life on earth.

The definitions of "fossils" and "paleontological resources" have long vexed Congress and the agencies tasked with protecting them. After PRPA was passed, the Secretary of the Interior and the Secretary of Agriculture embarked on a *thirteen-year* notice-and-comment process during which numerous paleontologists and other scientists and citizens questioned the definitions of "paleontological resources," "fossils," and "paleontological interest." All raised concerns about the vagueness of those scientific terms and how the agencies would enforce violations of PRPA given the inherent ambiguities in the terms. The only thing that emerged after more than a decade of requests for clarity was that there was no clarity—and never would be—because what exactly constitutes a "paleontological resource" changes over time and is not capable of being understood by a lay person. In response, both agencies made clear that federal land managers charged with on-the-ground decision making would be required to rely on the only people who might possibly be able to determine what "paleontological resources" are: private-sector experts with specialized training like museum curators, academics, and other non-agency paleontologists. This state of confusion thus resulted in an unconstitutional delegation of power to non-governmental actors.

As the public's lengthy dialog with the agencies about PRPA makes clear, the amorphous and ever-shifting definition of "paleontological resources," "fossils," and "paleontological interest" violates due process and the separation of powers because these definitions: (1) fail to provide people of ordinary intelligence with notice of the statute's prohibited conduct; and (2)

---

[1] 16 U.S.C. § 470aaa.

encourage arbitrary and discriminatory enforcement. No court has construed PRPA or defined "paleontological resources," which further confirms the absence of a notice available to ordinary citizens. Additionally, the government's attempt to enforce the statute here is contrary to the rule of lenity, which mandates that ambiguities in the breadth of a criminal statute be resolved in the defendant's favor. Indeed, not even the Indictment in this case describes how the alleged fossils involved are "paleontological resources," or explains what information they provide about "the history of life on earth." As explained in Defendants' separate motion to dismiss the Indictment, these failures result in unconstitutional lack of notice and double jeopardy problems, and set up a variance between the allegations in the Indictment and the proof that will be offered at trial.

PRPA's structure shares certain similarities with the Archeological Resource Protection Act, a statute Congress was required to re-draft after the Ninth Circuit found the statute's original definition of "objects of antiquity" to be void for vagueness. Like the prior version of ARPA, the PRPA is unconstitutionally vague as a matter of law, providing no notice to Defendants as to how they had violated PRPA's prohibitions relating to "paleontological resources." Defendants therefore move to dismiss Counts 1, 2, 3, 4 and 6 of the Indictment pursuant to Fed. R. Crim. P. 12(b)(3).

## Background

## I.      The Paleontological Resource Preservation Act.

### A.      *Legislative History*

The Department of the Interior has long acknowledged that "the laws and regulations under which the bureaus have managed, protected, and curated fossils have not always been clearly

understood or uniformly implemented."[2] The vagueness of the rules surrounding the collection of fossils and the inconsistent enforcement of those rules were highlighted following the record-breaking sale of Sue the Tyrannosaurus Rex for $8.4 million in 1997, the largest and most complete specimen ever recovered.[3] Congress, specifically the Senate Appropriations Committee, was "aware that no unified Federal policy exist[ed] regarding" fossils on federal lands, and in a report dated June 26, 1998, directed the Secretary of the Interior, in consultation with the Bureau of Land Management, the National Park Service, the United States Forest Service, and the Smithsonian Institution, to prepare a report on fossil resource management on Federal lands.[4]

In May 2000, DOI submitted this report (the "May 2000 Report") to Congress.[5] As relevant here, DOI acknowledged that determining which types of fossils were "scientifically significant" was complicated. For example, DOI noted both that "a few kinds of vertebrate fossils . . . are relatively common," and that it is often difficult to tell which fossils are and are not scientifically valuable.[6] The May 2000 Report further noted that while "invertebrates and plants are relatively abundant in the fossil record," some are nevertheless "just as rare as the rarest vertebrates."[7] DOI

---

[2] Paleontological Resources Preservation, 87 Fed. Reg. 47,296 (Aug. 2, 2022) (to be codified at 36 C.F.R. pt. 2; 43 C.F.R. pts. 49, 8360; 50 C.F.R. pt. 27).

[3] *SUE the T. rex*, FIELD MUSEUM, (Feb. 5, 2018), https://www.fieldmuseum.org/blog/sue-t-rex; *see also* Introductory Remarks to S.2727 of Sen. Daniel K. Akaka, 148 CONG. REC. S94, S6709, (daily ed. July 12, 2002) ("With the popularity of paleontology programs on the Discovery Channel and movies like Jurassic Park, people are starting their own collections at home, and corporations are buying fossils as investments, similar to the purchase of works of art. For example, the complete skeleton of a T-Rex was recently sold for $8.6 million at auction to the Field Museum of Chicago.").

[4] S. REP. No. 105-227, at 60 (1998).

[5] U.S. DEP'T OF THE INTERIOR, ASSESSMENT OF FOSSIL MANAGEMENT ON FEDERAL & INDIAN LANDS (2000).

[6] *Id.* at 25.

[7] *Id.* at 27.

ultimately provided no guidance to assist individuals when determining which fossils are "scientifically significant."[8]

In 2001, acting on the recommendations in the May 2000 Report, Senator Daniel Akaka of Hawaii introduced legislation that would eventually become PRPA. That bill, S.2727, defined "paleontological resource" as "any fossilized remains, traces, or imprints of organisms, preserved in or on the Earth's crust."[9] At a July 23, 2001 hearing of the Senate Subcommittee on National Parks, Senator Craig Thomas (Wyoming) commented that S.2727 was "so broad that it distresses me a little bit."[10] He opined, "I think there needs to be more definition of what it is you are preserving," because "I do not want to be afraid to go out and look for rocks somewhere on the BLM in Wyoming."[11] In an apparent response to those concerns, S.2727 was amended during the committee markup process to narrow the definition of paleontological resources from "any fossilized remains" to cover only fossilized remains "that are of paleontological interest"— whatever that means—and that "provide information about the history of life on earth," which provided no guidance on which fossils are protected and which are not.[12]

Although the 107th Congress did not pass or even vote on S.2727, those changes to the definition of "paleontological resources" were carried forward when the bill was reintroduced in subsequent Congresses. Ultimately, the 111th Congress enacted PRPA as part of the Omnibus

---

[8] *Id.* at 28.

[9] Paleontological Resources Preservation Act, S. 2727, 107th Cong. (2002), 148 CONG. REC. S94,S6709 (daily ed. Jul. 12, 2002)*.*

[10] *Illegal Trafficking of Archaeological Resources; Protection of Paleontological Resources; and Designate Certain Waterways in Puerto Rico: Hearing before the Subcomm. On Nat'l Parks of the Comm. On Energy and Nat. Res.*, 107th Cong. 20 (2002).

[11] *Id.*

[12] Paleontological Resources Preservation Act, S. 2727, 107th Cong. (2002).

Public Land Management Act of 2009,[13] and the enacted legislation's definition of "paleontological resources" is identical in all relevant respects to the definition in S.2727, including the amendments made to address Senator Thomas's concern that the term should not include "all fossils."

B.      Statutory Language.

On March 30, 2009, Congress enacted PRPA to protect "paleontological resources" on federal land.[14] PRPA defines "paleontological resources" as "*any fossilized remains, traces, or imprints of organisms, preserved in or on the earth's crust, that are of paleontological interest and that provide information about the history of life on earth*."[15] PRPA does not further define "fossilized remains" or "paleontological interest," nor does it include any definition or limitation on the vast scope of material that might "provide information" about the "history of life on earth."[16]

Relying on this overly broad and vague definition of "paleontological resources," PRPA went on to proscribe the following conduct: (i) removing "any paleontological resource" from federal land without statutory or administrative permission;[17] (ii) exchanging or receiving "any paleontological resource" if the person doing so knew or should have known "such resource" to have been removed from federal land[18] in violation of federal law;[19] (iii) selling or purchasing "any paleontological resource if the person doing so knew or should have known that "such resource"

---

[13] Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991.

[14] 16 U.S.C. § 470aaa-1.

[15] 16 U.S.C. § 470aaa(4).

[16] 16 U.S.C. § 470aaa(4).

[17] 16 U.S.C. § 470aaa-5(a)(1).

[18] In this context, "Federal land" means "land controlled or administered by the Secretary of the Interior, except Indian land" and "National Forest System land controlled or administered by the Secretary of Agriculture." 16 U.S.C. § 470aaa(2).

[19] 16 U.S.C. § 470aaa-5(a)(2).

was removed from federal land;[20] and (iv) making or submitting a false label for or a false identification of "any paleontological resource" removed from federal land.[21]

      *C.*     *Agency Regulations.*

Because PRPA applies to lands managed by the Secretary of the Interior and the Secretary of Agriculture,[22] Congress specifically directed those officials to "manage and protect paleontological resources . . . using scientific principles and expertise"[23] and to "issue such regulations as are appropriate to carry out [PRPA], providing opportunities for public notice and comment" "[a]s soon as practical."[24] The notice-and-comment period PRPA required turned into a thirteen-year odyssey.[25]

Once the public became involved in the rulemaking process, it became clear that ambiguities in the terms "fossils," "paleontological resources," and "paleontological interest" were unworkable and threatened to swallow the statutory definitions. For example, although commenters[26] asked for clarity regarding PRPA's amorphous definition of "paleontological resources," the agencies made clear they had no interest in clarifying Congress's vague statutory language through the rulemaking process because what is or is not a "paleontological resource"

---

[20] 16 U.S.C. § 470aaa-5(a)(3).

[21] 16. U.S.C. § 470aaa-5(b).

[22] 16 U.S.C. § 470aaa(2), (5).

[23] 16 U.S.C. § 470aaa-1(a).

[24] 16 U.S.C. § 470aaa-9.

[25] Paleontological Resources Preservation, 78 Fed. Reg. 30,810, 30,811 (May 23, 2013) (to be codified at 36 C.F.R. pts. 261, 291).

[26] Paleontological Resources Preservation, 80 Fed. Reg. 21,587, 21,588 (Apr. 17, 2015) (to be codified at 36 C.F.R. pts. 214, 261, 291) ("Comments were received from the public (almost equally distributed among professional academic paleontologists, consultants, and students in higher education, and amateur collectors and individuals that did not identify an affiliation), paleontological repository institutions, and government and/or quasi-government agencies.").

changes over time depending on where a fossil is located and the information available to expert paleontologists, among other things.[27] Ultimately, the United States Department of Agriculture implementing regulations simply parroted the definition in PRPA, whereas DOI tried to rewrite the statute to state that all fossils are paleontological resources until DOI says otherwise—the sort of definition that concerned Senator Thomas and that Congress explicitly *rejected*.

Both agencies also made clear they were forced to rely on external private paleontologists, museum curators, and other scientific and technical experts to help them determine what fossils are "paleontological resources" when policing and enforcing PRPA.[28] That reality is reflected not just in the agencies' responses to public comments, but also in the final regulations.[29]

---

[27] *See, e.g.*, Paleontological Resources Preservation, 78 Fed. Reg. at 30,811.

[28] *See, e.g.*, Paleontological Resources Preservation, 87 Fed. Reg. at 47,299 (addressing comments from "scientists and repository managers" concerned that federal land managers "lack expertise and education sufficient to adequately manage paleontological resources" by explaining that "when managing paleontological resources Federal land managers rely on informed input from many sources, including, but not limited to, paleontologists, geologists, biologists, museum curators, law enforcement rangers, historians, other agencies and institutions, and the public"); Paleontological Resources Preservation, 80 Fed. Reg. at 21,608 ("From an administrative and organizational perspective, an Authorized Officer cannot be expected to have specialized expertise in every subject matter area in which they may be required to exercise decision-making authority."); *id.* ("Paleontological subject matter experts are affiliated with a number of repository institutions with which the Forest Service maintains partnership agreements. Additional subject matter experts may be identified by searching recent paleontological publications in professional journals.").

[29] 43 C.F.R. § 49.200 (2024) (federal land manager makes determinations about whether specimens "further paleontological knowledge, public education, or management of paleontological resources" "in coordination with appropriate subject matter experts"); 43 C.F.R. § 49.810 (2024) (federal land managers "determine which non-vertebrate paleontological resources are scientifically rare or unique" "[i]n consultation with knowledgeable paleontologists"); 36 C.F.R. § 291.9 (2024) (a federal land manager's determinations regarding what is or is not a paleontological resource require written recommendation "prepared by a paleontologist with demonstrated subject matter expertise in the specific group of paleontological resources under consideration," which is then reviewed by "[a]n Agency paleontologist," who then "make[s] a recommendation . . . concerning the determination" to the federal land manager"); 36 C.F.R. § 291.24 (2024) (requiring a federal land manager to make decisions regarding

1.      Forest Service Rulemaking.

On May 23, 2013, the United States Forest Service, a component of USDA, published a proposed set of regulations for public comment.[30] Among other things, the Forest Service proposed a rule recognizing that not all fossils are "paleontological resources" for purposes of PRPA:

> In informal usage, the term *fossil* tends to be used interchangeably with the term *paleontological resource*. However, under [PRPA] and these proposed regulations, a *fossil* may not necessarily be a *paleontological resource*. Remains, traces, or imprints of organisms (i.e., *fossils*) are only considered paleontological resources under the Act and the proposed regulations if they are: (1) Fossilized, (2) of paleontological interest, and (3) provide information about the history of life on earth. Therefore, paleontological resources are fossils that have paleontological interest and provide information about the history of life on earth. An example of a fossil that may not be a paleontological resource because it lacks paleontological interest and provides negligible information about the history of life on earth would be an isolated, unidentifiable fragment of an otherwise common invertebrate fossil that was eroded from its native geologic occurrence and subsequently found in a stream bed far from its point of origin.[31]

Notably, this description implies that whether a particular fossil is a paleontological resource depends not only on its intrinsic characteristics, but also on where it is located at any particular point in time. As suggested by the example in the proposed rule, something that was once a paleontological resource might cease to qualify if it is washed downstream, presumably because it would no longer provide sufficient "information" to paleontologists.

Since "[n]ot all fossils are paleontological resources," the Forest Service proposed rule included "a process [for federal land managers] to determine whether certain fossils should or should not be managed as "paleontological resources."[32] "This determination would be based on

---

"reproducing a paleontological resource" or "consumptive analysis of specimens" "in consultation with an Agency paleontologist").

[30] Paleontological Resources Preservation, 78 Fed. Reg. 30,810.

[31] *Id.* at 30,812 (emphasis in original).

[32] *Id.* at 30,813.

scientific principles and methods, would be documented in writing, be prepared by a qualified paleontologist, and would provide the necessary framework to . . . satisfy[] the mandate at 16 U.S.C. 470aaa-1 that requires management use scientific principles and expertise."[33] Indeed, the version of this provision contained in the Forest Service's final rule requires written input from *two* trained paleontologists, at least one of whom does not work for the agency: "a written recommendation for determination would be prepared by a paleontologist with expertise in the group of fossils in question, [and] such written recommendation would be reviewed by an Agency paleontologist, and … the Authorized Officer would consider the resulting recommendation of the Agency paleontologist in making a determination."[34] Even so, the Forest Service acknowledged that guidance from experts could prove unreliable, as "[s]uch determinations" (determinations about what is or is not a paleontological resource and thus what is or is not covered by PRPA) "*may change over time as new information comes to light*."[35]

When the Forest Service published its final rule on April 17, 2015, it responded to the 177 comments that the agency received during the 60-day notice-and-comment period.[36] Many of those comments asked for clarity regarding what is, or is not, a paleontological resource.[37] On each occasion, the agency simply stated that its definition matched the definition in PRPA. Other commenters addressed the definition of "fossil"—relevant here because only "*fossilized* remains, trace, or imprints of organisms" can be paleontological resources—and asked the Forest Service

---

[33] *Id.*

[34] Paleontological Resources Preservation, 80 Fed. Reg. at 21,608.

[35] *Id.* at 21,607.

[36] Paleontological Resources Preservation, 80 Fed. Reg. 21,587.

[37] *Id.* at 21,602 ("Comment: Definition of paleontological resources is too broad and ambiguous."); *id.* at 21,601 ("Comment: Definition of paleontological resources does not recognize diversity of types of fossils.").

to include in that definition "a component of geologic time; specifically that organic remains and/or traces that post-date the Pleistocene epoch (post-glacial time) not be considered as fossils."[38] One of those commenters made the point that a time limitation would ensure that "organic remains and/or traces that occur in archeological time frames and/or modern sediment deposits originating from catastrophic events such as floods or mud entrapment not be considered as fossils."[39] The Forest Service not only refused to incorporate a temporal limitation in its definition of "fossils," but explicitly left open the possibility that organic remains "originating from catastrophic events that occurred not more than several decades before the present" could be "fossils" (and, hence, "paleontological resources"), saying only that such remains "would *generally* not be considered fossils."[40]

The Forest Service also addressed comments asking for clarity regarding the definition of "common plant and invertebrate fossils,"[41] which is significant because PRPA expressly allows for permitless "casual collection" of such fossils even if they are paleontological resources.[42] While rejecting these requests, the Forest Service explained: "It is not practical to address in regulations each factor that could be pertinent to determination of what constitutes common or rare

---

[38] *Id.* at 21,598.

[39] *Id.*

[40] *Id.* (emphasis added).

[41] Paleontological Resources Preservation, 80 Fed. Reg. at 21,596.

[42] 16 U.S.C. § 470aaa ("The term 'casual collecting' means the collecting of a reasonable amount of common invertebrate and plant paleontological resources for non-commercial personal use, either by surface collection or the use of non-powered hand tools resulting in only negligible disturbance to the Earth's surface and other resources."); *id.* ("As used in this paragraph, the term[] . . . 'common invertebrate and plant paleontological resources' . . . shall be determined by the Secretary."); 16 U.S.C. § 470aaa-3(a)(2) ("The Secretary shall allow casual collecting without a permit on [certain] Federal land . . . .").

with respect to common invertebrate and plant paleontological resources."[43] Even providing a list of such fossils was impossible, per the Forest Service, because "an assessment of commonness or rarity would not necessarily apply universally to a particular taxon, and is therefore not appropriate for determination in the form of a taxonomic list."[44] The only comfort the agency provided to commenters who "suggested that without expert knowledge, it would be difficult for amateur collectors to determine if a specimen is rare or common" was to say that a "collector would not *necessarily* be placed in jeopardy under the law for inadvertent collection of a rare specimen during casual collection"[45] depending on the USDA's exercise of discretion.[46]

2.    DOI Rulemaking.

The Department of the Interior published proposed regulations implementing PRPA for DOI-managed federal lands on December 7, 2016,[47] and DOI published its final rule and responses to comments from the public on August 2, 2022.[48] Like the Forest Service, DOI contemplated that when determining what is or is not a "paleontological resource," federal land managers would "consult[] as appropriate with bureau technical specialists, outside experts, bureau partners, museum curators, or others"[49] and "rely on informed input from many sources, including, but not limited to, paleontologists, geologists, biologists, museum curators, law enforcement rangers,

---

[43] Paleontological Resources Preservation, 80 Fed. Reg. at 21,597.

[44] *Id.*

[45] *Id.* (emphasis added).

[46] *Id.* at 21,611 ("Department law enforcement specialists may employ discretion in enforcement sufficient to address circumstances of inadvertent casual collection of specimens which may be uncommon, not invertebrate, and/or not plant paleontological resources.").

[47] Paleontological Resources Preservation, 81 Fed. Reg. 88,173 (Dec. 7, 2016) (to be codified at 43 C.F.R. pts. 49, 8360; 50 C.F.R. 27).

[48] Paleontological Resources Preservation, 87 Fed. Reg. 47,296.

[49] Paleontological Resources Preservation, 81 Fed. Reg. at 88,174.

historians, other agencies and institutions, and the public."[50] Clearly, DOI understood that determining what is or is not a "paleontological resource" requires highly specialized knowledge and training, along with input from private parties.

Unlike the Forest Service, however, DOI attempted to redefine "paleontological resources" to include "any fossilized remains, traces, or imprints of organisms preserved in or on the Earth's crust" except for "[r]esources determined in writing by the authorized officer [i.e., the federal land manager] to lack paleontological interest or not provide information about history of life on earth, based on scientific and other management considerations."[51] "Thus, under PRPA and the proposed regulation, fossils are 'paleontological resources' unless they . . . are determined by an authorized officer to lack paleontological interest or not provide information about the history of life on earth."[52] In effect, all fossils are paleontological resources until DOI says otherwise.

The public understandably had many questions and comments about this definition, and asked DOI, among other things, to define "paleontological interest," but the agency expressly refused to do so.[53] DOI justified its refusal by asserting that "any definition may become outdated—for instance, as scientific knowledge develops or management practice changes."[54] In lieu of a definition, DOI said only that "[a] fossil might be determined not to have paleontological interest for reasons that might include, but are not limited to, redundancy or loss of context," and gave as an example: "a Federal land manager may determine that a particular exposure of

---

[50] Paleontological Resources Preservation, 87 Fed. Reg. at 47,299.

[51] Paleontological Resources Preservation, 81 Fed. Reg. at 88,175.

[52] *Id*.

[53] Paleontological Resources Preservation, 87 Fed. Reg. at 47,299 ("Several commenters expressed the view that the bureaus should define the concept of 'paleontological interest,' narrowly if possible.").

[54] *Id*.

abundantly represented and extensively researched shark teeth is so highly redundant that it does not contribute new information and, therefore, lacks paleontological interest."[55]

DOI likewise failed to offer meaningful guidance regarding which fossils "provide information about the history of life on earth."[56] Instead, the agency only cryptically responded that "Fossils . . . would be considered paleontological resources when they, as part of a scientific research design, provide critical information toward the understanding of geological units, biological evolution, climate change, and other scientific questions."[57]

DOI's treatment of these terms makes clear that ordinary citizens cannot be expected to assess whether a fossil "provide[s] information about the history of life on earth" such that it might be a paleontological resource under PRPA.[58] For example, according to DOI, a "specimen may . . . not offer important or new information about the history of life on Earth" even if that specimen is "exceptionally well preserved, unusual, [or] even 'rare'."[59] Because ordinary citizens cannot rely on their own knowledge, experience, or even common sense, DOI cautioned that this inquiry "should always be done in consultation with a qualified paleontologist."[60]

Finally, DOI's regulations further depart from a common sense understanding of the relevant terms in that they attempt to redefine "paleontological resources" to include *all* fossils— a definition which, as noted, Congress specifically drafted PRPA to exclude. The DOI's definition thereby expanded PRPA's coverage to materials that no ordinary person would expect to be

---

[55] *Id.*

[56] 16 U.S.C. § 470aaa(4).

[57] Paleontological Resources Preservation, 81 Fed. Reg. at 88,175.

[58] 16 U.S.C. § 470aaa(4).

[59] Paleontological Resources Preservation, 87 Fed. Reg. at 47,313.

[60] *Id.*

protected by the statute. To illustrate, DOI's proposed regulations adopted the same definition of "fossilized" as the Forest Service—i.e., "[f]ossilized means preserved by natural processes, such as burial in accumulated sediments, preservation in ice or amber, or replacement by minerals"[61]— and as discussed above, this definition does not require "fossils" to be particularly old. So under DOI regulations, fish frozen in ice during a particularly cold winter are "fossils," and would be "paleontological resources" unless or until a federal land manager made a written determination that the fish were not "of paleontological interest."[62]

Although a commenter pointed out that the "proposed rule's definition of 'fossilized' was unclear," DOI doubled down and said that its definition "reflects the common understanding of what is fossilized."[63] The only concession DOI made was to "clarify" that fossils must contain "evidence or remains of *once-living* organisms," but the agency left the other language unchanged.[64] In other words, under DOI regulations—but not Forest Service regulations—frozen fish are fossils and, hence, paleontological resources.

DOI did not explain why it thought it needed to rewrite PRPA's definition of "paleontological resources," but the answer is plain. DOI knew that it—like the public—was not capable of making case-by-case determinations regarding what is or is not "of paleontological interest" without extensive input from scientific experts. Thus, it was simply easier for enforcement purposes to treat "all fossils" as "paleontological resources" until proven otherwise.

---

[61] Paleontological Resources Preservation, 81 Fed. Reg. at 88,188.

[62] *See, e.g.*, Sean Breslin, *Fish Frozen in Wall of Ice at South Dakota's Lake Andes National Wildlife Refuge*, THE WEATHER CHANNEL (Jan, 17, 2017), https://weather.com/news/news/frozen-fish-viral-image-south-dakota

[63] Paleontological Resources Preservation, 87 Fed. Reg. at 47,299.

[64] *Id.*

**Argument**

"In our constitutional order, a vague law is no law at all."[65] As the Supreme Court recently explained, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them."[66] Congress is not permitted to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and should be set at large."[67]

The prohibition against vague laws "rests on the twin constitutional pillars of due process and separation of powers."[68] Courts may thus find a statute unconstitutionally vague "for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."[69]Of the two concerns, "the more important . . . is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement."[70]

Also bound up in the vagueness prohibition is the rule of lenity, which teaches "that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor."[71]

---

[65] *United States v. Davis*, 588 U.S. 445, 447 (2019).

[66] *Id*. at 447–48.

[67] *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (quoting *United States v. Reese*, 92 U.S. 214, 221 (1875)).

[68] *Davis*, 588 U.S. at 451.

[69] *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

[70] *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (cleaned up); *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1237 (10th Cir. 2023) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis") (quoting *Granyned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

[71] *Davis*, 588 U.S. at 464.

Like the prohibition against vagueness, the rule of lenity focuses on the rights of individuals and "on the plain principle that the power of punishment is vested in the legislative, not in the judicial department."[72]

A statute can be deemed unconstitutionally vague as a matter of law when it "proscribe[s] no comprehensible course of conduct at all."[73] Facial vagueness challenges to criminal statutes are subject to a less demanding standard than facial challenges to civil statutes.[74]

## I.  PRPA's Definition of "Paleontological Resource" Unconstitutionally Vague on Its Face.

"[T]he due process protection against vague regulations does not leave regulated parties at the mercy of *noblesse oblige*."[75] But PRPA's vague and circular definition of "paleontological resources" does just that. While PRPA purports to limit "paleontological resources" to fossils "*that*

---

[72] *Id*. (citations and quotations omitted); *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) (describing the rule of lenity as a "junior version of the vagueness doctrine") (citation omitted).

[73] *United States v. Powell*, 423 U.S. 87, 92 (1975); *see also United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921) (declaring facially vague a statute prohibiting "unjust or unreasonable rate[s] or charge[s]" because it "forbids no specific or definite act" and "leaves open . . . the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against."); *Morales*, 527 U.S. at 57 (finding loitering ordinance facially vague even though definition of "loitering" was plain); *Smith v. Goguen*, 415 U.S. 566, 573–74 (1974) (finding flag treatment statute facially vague because it "fail[ed] to draw reasonably clear lines between the kinds of nonceremonial treatment that are criminal and those that are not").

[74] *Kolender*, 461 U.S. at 358 n.8 (stating that where a statute imposes a criminal penalty, courts can invalidate it "even when it could conceivably have had some valid application."); *Jane L. v. Bangerter*, 61 F.3d 1493, 1502 (10th Cir. 1995), *cert. granted, judgment rev'd sub nom. Leavitt v. Jane L.*, 518 U.S. 137 (1996) (per curiam) (reversed as to severability) (noting "less demanding *Kolender* standard" applicable to facial vagueness challenges in criminal cases); *Johnson v. United States*, 576 U.S. 591, 602 (2015) (finding that a law cannot be saved from a void-for-vagueness challenge "merely because there is some conduct that clearly falls within the [void] provision's grasp.").

[75] *F.C.C. v. Fox Tel. Stations, Inc.*, 567 U.S. 239, 255 (2012) (cleaned up) (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)).

*are of paleontological interest and that provide information about the history of life on earth*," this is no limiting provision.[76]

First, the attempt to define "paleontological resources" by reference to items that are "of paleontological interest" is a tautology.[77] In addition, agency implementing regulations expressly make clear that the statute incorporates a shifting notion of "paleontological interest" into the purportedly "plain" text of the statute.[78] As these regulations demonstrate, what may be "of interest" to paleontologists can range from fossilized materials at the molecular level[79] to recently deceased fish frozen in a cold winter to large intact skeletons of extinct creatures—and may change over time. Same with the second "limiting" factor, *i.e.*, that material provide "information about the history of life on Earth." All paleontological material, even material that may be of no obvious "paleontological interest," provides some "information" about the history of life on Earth.[80]

Even the agencies charged with enforcing PRPA recognized that there will routinely be circumstances in which expert paleontologists will disagree about whether an item is of

---

[76] *See, e.g.*, *Davis*, 588 U.S. at 470 ("Congress might … avoid vagueness … by defining crimes of violence to include certain enumerated offenses or offenses that carry certain minimum penalties. All these options and more are on the table. But these are options that belong to Congress to consider[.].").

[77] *Cf.* *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1273 n.9 (10th Cir. 2017) ("[T]he statutory language is circular, in effect, a 'tautology,' because it defines an owner as an owner.").

[78] *See* Paleontological Resources Preservation, 87 Fed. Reg. at 47,299 ("defining paleontological interest did not appear to be necessary or advisable, particularly since any definition may become outdated—for instance, *as scientific knowledge develops or management practice changes*.") (emphasis added).

[79] *See* Yanhong Pan, *Molecular paleontology as an exciting, challenging and controversial field*, 7 NAT'L SCIENCE REV., April 2020, at 823, https://doi.org/10.1093/nsr/nwaa001 (available at https://academic.oup.com/nsr/article-pdf/7/4/823/38881108/nwaa001.pdf).

[80] *See, e.g.*, *Fossil*, ENCYCLOPEDIA BRITANNICA, (May 17, 2024) https://www.britannica.com/science/fossil ("In recent years, geologists have been able to study the subsurface stratigraphy of oil and natural gas deposits by analyzing microfossils obtained from core samples of deep borings.").

"paleontological interest."[81] That expert paleontologists are required to define the key term in a criminal statute is a hallmark of vagueness, and comparable statutes that require expert assistance to interpret scientific statutory terms have been routinely struck down on vagueness grounds.[82]

Given the limitless sweep of the purported definition of "paleontological resources," Congress must return to the drawing board. "[T]he role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again."[83] Like other statutes that have been declared void for vagueness, PRPA is one of "those *rare* instances where a legislature has enacted a statute which is so totally vague as to proscribe no comprehensible course of conduct at all."[84] This is particularly true here, where the government has elected to charge the Defendants under the criminal rather than the civil provisions of PRPA without alleging the requisite mens rea for a criminal violation of the statute[85]

---

[81] *See* Paleontological Resources Preservation, 87 Fed. Reg. at 47,313 ("In cases where the qualified paleontologist and the collector do not agree on the importance of the specimen, or where multiple paleontologists disagree, the Federal land manager makes the final determination of what is not common.").

[82] *See, e.g., Colautti v. Franklin*, 439 U.S. 379, 395–97 (1979) ("standard-of-care" and "viability" terms in Pennsylvania abortion statute were facially void for vagueness because of the subjective nature of the terms and the "prospect of [expert] disagreement" about their meaning); *Jane L.*, 61 F.3d at 1501 (Utah criminal statute banning "experimentation" with fetal tissue was void for vagueness because there existed "several competing and equally viable definitions" of the term); *Forbes v. Woods*, 71 F. Supp. 2d 1015, 1020 (D. Ariz. 1999) ("The lack of consensus as to what these words [experimentation, investigation, and routine] mean, the criminal penalty for violation of this statute, and the explosion of technology makes it impossible for the physicians to know which procedures may be forbidden[.]").

[83] *Davis*, 588 U.S. at 448.

[84] *United States v. Morales-Lopez*, 92 F.4th 936, 941–42 (2024) (emphasis in original) (quoting Powell, 423 U.S. at 92 (cleaned up).

[85] *Kolender*, 461 U.S. at 358 n.8 (where "a statute imposes criminal penalties, the standard of certainty [that due process requires] is higher.").

A.      *No Court Cases Have Construed PRPA or Defined "Paleontological Resources"*

This is a case of first impression. "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."[86] Here, there is not a single court case construing PRPA, or the definition of "paleontological resources." No pattern jury instructions define the elements of a criminal PRPA violation, and no jury instructions appear to have ever been provided to a jury hearing evidence in a criminal PRPA case. While PRPA directs the Secretaries of the Interior and of Agriculture to "establish a program to increase public awareness about the significance of paleontological resources," it does not appear that they ever did so.[87] Given the complete absence of guidance from the courts (as well as the legislature and enforcing agencies, as set forth above and below), it is impossible for an ordinary citizen like Steven Willing be expected to know what "paleontological resources" are or what PRPA prohibits.[88]

B.      *The USDA and DOI Implementing Regulations Compound PRPA's Vagueness.*

While agency guidance may sometimes "suffice to clarify a standard with an otherwise uncertain scope,"[89] the USDA and DOI's implementing regulations in practice do not clarify or limit what "paleontological resources" are. On the contrary, those regulations make clear only that

---

[86] *Lanier*, 520 U.S. at 266; *see also id.* at 267 (limiting statute's coverage to "rights fairly warned of, having been 'made specific' by the time of the charged conduct.").

[87] 16 U.S. Code § 470aaa–2 – "Public awareness and education program"

[88] *See Fox Tel. Stations, Inc.*, 567 U.S. at 257 (finding defendant "lacked constitutionally sufficient notice" in the absence of agency decisions or agency guidance that it would target certain conduct as part of its enforcement policy); *see also United States v. Diaz*, 499 F.2d 113, 114 (9th Cir. 1974) (observing, as part of holding the Antiquities Act to be void for vagueness, that "[c]ounsel on neither side was able to cite an instance prior to this in which conviction under the statute was sought by the United States").

[89] *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 504 (1982).

transparency around the term does not exist,[90] and indeed cannot exist as PRPA can only be understood—if at all—by an expert in the field of paleontology and other private specialists.

First, the notice-and-comment process leading to the promulgation of DOI and Bureau of Land Management ("BLM") rules emphasized the fact that the public cannot understand the terms of PRPA without reference to extra-statutory, specialized criteria:

> The Act requires the bureaus to retain the responsibility to determine which non-vertebrate paleontological resources are not common. However, determining what is common or not common should always be done in consultation with a qualified paleontologist. What is not common should be determined by the scientific importance of the specimen and not simply on its rarity or condition of preservation. *Thus, some fragments of otherwise rare specimens might be common.* An exceptionally well preserved, unusual, and even ''rare'' specimen may be common according to this regulation if it does not offer important or new information about the history of life on Earth.[91]

This insistence that laypeople *cannot* understand whether a fossil is or is not "common" or whether it offers "important or new information about the history of life on earth" is again emphasized in BLM's refusal to attempt to provide a definition of the vague phrase "of paleontological interest." In the same Final Rule commentary, BLM acknowledged that "several commenters expressed the view that the bureaus should define the concept of 'paleontological interest' narrowly if possible," but then declined to provide any such guidance or limiting definition.[92] Instead, BLM noted that the definition could not and should not be further defined because of the likelihood that the understanding of that phrase was constantly shifting:

> Under the Act and these regulations, the concept of paleontological interest is relevant only to the determination of whether or not a fossil is a paleontological resource. If a fossil is determined to lack paleontological interest, it is not considered a "paleontological resource" and is not subject to the Act and these

---

[90] *See* Paleontological Resources Preservation, 80 Fed. Reg. at 21,602 ("The definition of paleontological resources in the regulations restates the definition in the Act.").

[91] Paleontological Resources Preservation, 87 Fed. Reg. at 47,313 (emphasis added).

[92] *Id.* at 47,299.

regulations. However, due to the savings provision of the Act and these regulations, even if a fossil is determined not to be a paleontological resource, it is still subject to other laws and regulations. The concept of paleontological interest is not relevant for any other purposes under the Act and these regulations. Therefore, defining paleontological interest did not appear to be necessary or advisable, particularly since any definition may become outdated—for instance, *as scientific knowledge develops or management practice changes*.[93]

Worse, DOI affirmatively *expanded* the definition of "paleontological resource" to include the very definition Congress rejected.[94]

Similarly, in seeking to define the concept of "casual collecting"—an example of the generally lawful act of fossil collection on federal land in the United States—the DOI, like the BLM, specifically notes that a layperson *cannot* know what is or is not a "common" specimen subject to lawful collection. Rather, the relevant regulation on this point states that "[i]n consultation with *knowledgeable paleontologists*, the Federal land manager will determine which non-vertebrate paleontological resources are scientifically rare or unique and are therefore not common."[95] In other words, only a "knowledgeable paleontologist" can determine which "paleontological resources" are subject to enforcement under the statute. This regulation both attempts to announce a new crime[96] and does so while expressly acknowledging that a person of reasonable intelligence *cannot* know if he or she is violating the law.

Given the inherent vagueness in PRPA's statutory provisions, it is unsurprising that the agencies charged with implementing PRPA have declined to remedy the statute's vagueness

---

[93] *Id.* (emphasis added).

[94] *Id.* ("Fossils are presumed to be paleontological resources . . . .").

[95] 43 C.F.R. § 49.810(c) (2024) (emphasis added).

[96] 43 C.F.R. § 49.810(d) (2024) ("Collecting common non-vertebrate paleontological resources inconsistent with this subpart is a prohibited act and may result in civil or criminal penalties.")

through a meaningful definition that can guide a person of reasonable intelligence. Their failure to do so underscores the due process violation created by the government's prosecution in this case.

### C. PRPA Lacks the Constitutional Safeguards Found in its Statutory Predecessor, the Archeological Resource Protection Act.

PRPA shares superficial similarities with the Archeological Resource Protection Act of 1979 ("ARPA"),[97] but PRPA differs from ARPA in at least one key respect: ARPA's definition of "archeological resources" was carefully drafted to avoid the issues that led the Ninth Circuit to invalidate its predecessor statute's definition of "antiquities" on vagueness grounds.[98] The Antiquities Act made it a crime to "appropriate . . . any object of antiquity, situated on lands owned or controlled by the government of the United States."[99] The statute did not define the phrase "object of antiquity," which was an anthropological term of art that "could include something that was made just yesterday if related to religious or social traditions of long standing."[100] Because "there was no notice whatsoever given by the statute that the word 'antiquity' can have reference not only to the age of an object but also to the use for which the object was made," the Ninth Circuit concluded that "the statute, *by use of undefined terms of uncommon usage*, is fatally vague in violation of the due process clause."[101]

When drafting ARPA to replace the unconstitutional provisions in the Antiquities Act,[102] Congress took steps to narrowly and precisely define the term "archeological resources." Although

---

[97] 16 U.S.C. §470aa.

[98] *Diaz*, 499 F.2d at 114–15.

[99] *Id*. at 113 n.1.

[100] *Id.* at 114 (describing expert testimony from a professor of Anthropology received by the district court).

[101] *Id.* at 115 (emphasis added).

[102] The Congressional Record confirms that the *Diaz* decision was front of mind when Congress re-drafted ARPA. *See* 125 CONG. REC. at 17,393 (1979) (looting of artifacts on federal lands "was

ARPA still contains an abstract definition for archeological resources ("any material remains of past human life or activities which are of archaeological interest"), that sweeping language is subject to important qualifications. First, the statute itself specifies that the term should be "determined under uniform regulations promulgated pursuant to [ARPA]."[103] Congress, thus required administrative agencies to do for ARPA what DOI and BLM have expressly refused to do for PRPA: provide concrete guidance to the general public. Second, Congress did not rely solely on the notion that an agency would provide clarity to a vague term, and instead provided a long list of examples to flesh out the idea of "archeological interest."[104]

Finally, ARPA expressly included a temporal limitation, providing that "[n]o item shall be treated as an archaeological resource . . . unless such item is at least 100 years of age."[105] In fact, the Forest Service and DOI have both declined to apply a minimum age requirement when defining fossilization, and that decision applies to paleontological resources as well since they are required to be "fossilized remains."[106] And as discussed above, the absence of a minimum age requirement

---

exacerbated by the decision of the Ninth Circuit Court of Appeals which held the criminal provisions of the Antiquities Act unconstitutionally vague").

[103] 16 U.S.C. § 470bb(1).

[104] 16 U.S.C. § 470bb(1) ("Such regulations containing such determination shall include, but not be limited to: pottery, basketry, bottles, weapons, weapon projectiles, tools, structures or portions of structures, pit houses, rock paintings, rock carvings, intaglios, graves, human skeletal materials, or any portion or piece of any of the foregoing items.").

[105] 16 U.S.C. § 470bb(1); *see also* 125 CONG. REC. at 17,394 (1979) ("The 100-year time frame therefore imposes a more reasonable reference within common perception and cures the vagueness problems delineated in the *Diaz* decision as well.").

[106] 43 C.F.R. § 49.5 (2024) ("Fossilized means evidence or remains of once-living organisms preserved by natural processes, such as burial in accumulated sediments, preserved in ice or amber, permineralized, or replaced by minerals, which may or may not alter the original organic content."); 36 C.F.R. § 291.5 (2024) (substantially the same); *see also* Paleontological Resources Preservation, 80 Fed. Reg. at 21,598 ("Incorporation of an end-Pleistocene limit to determine whether or not a particular specimen is a fossil would be arbitrary and not based in science.").

means that frozen fish killed during a particularly cold winter are considered to be paleontological resources under the DOI regulations.

## II.     PRPA Violates the Non-Delegation Doctrine.

Because PRPA requires the assistance of private paleontologists and other private experts to determine whether items collected from federal land are "paleontological resources" of "paleontological interest," PRPA effectuates an unconstitutional delegation of power to the federal agencies charged with implementing it, as well as the Department of Justice and the federal courts.

The Constitution requires that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."[107] Under the "non-delegation doctrine," "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."[108] "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government."[109]

While the Supreme Court has upheld grants of rulemaking power to executive or judicial actors, Congress must, at the very least, "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.[110] The purpose of this "intelligible principle" standard is to ensure that courts are able to "ascertain whether the will of Congress has been obeyed."[111] Furthermore, when a delegation involves the power "to make federal crimes of acts that never had been such before and to devise novel rules of law in a field in

---

[107] U.S. CONST. art. I, § 1.

[108] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

[109] *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

[110] *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

[111] *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 218 (1989).

which there had been no settled law or custom,"[112] as it does in this case, the Supreme Court has noted that the Constitution may require "more specific guidance."[113]

As discussed above, because there are no adequate definitions of "paleontological resource" or "paleontological interest," there is no "intelligible principle" in PRPA. Nor is there any relevant judicial precedent that sheds light on what Congress's intent might have been at the time PRPA was enacted. Thus, any "intelligible principle" must come from the text of PRPA itself, which as discussed above, is missing from the statute.

As numerous agency comments and implementing rules make clear, the executive branch will only be able to enforce PRPA through the testimony of private paleontologists and other private experts.[114] Were this Court to decide what "paleontological resources" are based on private fact or expert witness testimony in this case, PRPA would be unconstitutionally delegating power to private individuals outside the government. Congress may not empower private individuals "to enact the laws they deem to be wise and beneficent,"[115] and a delegation of rulemaking authority to a private party "is legislative delegation in its most obnoxious form."[116] As the Supreme Court

---

[112] *See generally* *Fahey v. Mallonee*, 332 U.S. 245, 249 (1947).

[113] *See* *Touby v. United States*, 500 U.S. 160, 165–66 (1991).

[114] *See, e.g.*, 36 C.F.R. 291.9 (2024) ("A recommendation for determination must be in writing and be prepared by a paleontologist with demonstrated subject matter expertise in the specific group of paleontological resources under consideration."); Paleontological Resources Preservation, 87 Fed. Reg. at 47,299 ("when managing paleontological resources Federal land managers rely on informed input from many sources, including, but not limited to, paleontologists, geologists, biologists, museum curators, law enforcement rangers, historians, other agencies and institutions, and the public"); *also* Paleontological Resources Preservation, 80 Fed. Reg. at 21,608 ("From an administrative and organizational perspective, an Authorized Officer cannot be expected to have specialized expertise in every subject matter area in which they may be required to exercise decision-making authority.").

[115] *Schechter Poultry*, 295 U.S. at 537.

[116] *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (striking down statute granting coal producers and miners power to issue rules governing minimum wages).

has made clear, "a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property."[117]

If the Court were to interpret PRPA and the definition of "paleontological resources" based on the testimony of private fact and scientific witnesses in this case, it would make those witnesses the authors and editors of the law, not the facts. It is black-letter law that witnesses may not testify about the proper interpretation of a statute because statutory interpretation is the prerogative of the courts[118] Given that the BLM's own rulemaking procedures were unable to define a common understanding or meaning of "paleontological resources," "paleontological interest," or even "fossils," it would be highly problematic for federal courts to do so based on the testimony of private paleontologists and other private experts who were hand-picked by prosecutors.[119]

## III. Conclusion

For the foregoing reasons, the Court should dismiss those counts of the Indictment that charge or incorporate PRPA as a basis for criminal liability because PRPA is unconstitutionally vague as a matter of law.

**SIGNATURES TO FOLLOW**

//

//

---

[117] *Id.*

[118] *Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) (en banc) ("In no instance can a witness be permitted to define the law of the case.").

[119] *Wayman v. Southard*, 23 U.S. 1, 42 (1825) ("It will not be contended that Congress can delegate to the Courts, or to any other tribunals, powers which are strictly and exclusively legislative.").

DATED this 2nd day of July, 2024.

**KO LAW PLLC**


*/s/ Kyler E. Ovard*
Kyler E. Ovard
Tara L. Isaacson
**TARA ISAACSON LAW LLC**
*Attorneys for Vint Wade*

DATED this 2nd day of July, 2024.



**FERBRACHE LAW PLLC**

*/s/ Gregory N. Ferbrache*
Gregory N. Ferbrache
*Attorney for Donna Wade*

DATED this 2nd day of July, 2024.



**DENTONS DURHAM JONES
PINEGAR P.C.**

*/s/ Trinity Jordan*
Trinity Jordan
Aaron B. Clark
*Attorneys for Steven Willing*

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of July, 2024, I caused a true and correct copy of the foregoing to be filed using the Court's electronic filing system to all counsel of record.

*/s/ Shelby Irvin* _____
